UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE MCKESSON GOVERNMENTAL ENTITIES AVERAGE WHOLESALE PRICE LITIGATION | Master File No.: 1:08-CV-10843-PBS Judge Patti B. Saris |
| THIS DOCUMENT RELATES TO: *Connecticut v. McKesson Corp.* | No. 1:08-CV-10900-PBS |

### McKESSON CORPORATION'S OPPOSITION TO CONNECTICUT'S MOTION FOR SUMMARY JUDGMENT ON McKESSON'S STATUTE OF LIMITATIONS AND MITIGATION DEFENSES

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ......................................................................................................... ii

INTRODUCTION ....................................................................................................................... 1

ARGUMENT ............................................................................................................................... 2

I.  SUMMARY JUDGMENT SHOULD BE DENIED BECAUSE
    CONNECTICUT IS WRONG AS A MATTER OF LAW IN
    ASSERTING THAT THERE IS NO DUTY TO MITIGATE RICO
    DAMAGES................................................................................................................... 2

II. FACTUAL ISSUES CONCERNING WHEN CONNECTICUT'S DUTY
    OF MITIGATION AROSE, AND WHETHER THE STATE SATISFIED
    ITS DUTY, PRECLUDE SUMMARY JUDGMENT.......................................................... 5

    A.  Connecticut's Admission That It Has Known of the Alleged
        "Scheme" Since at Least 2006 Precludes Summary Judgment. ............................ 5

    B.  Summary Judgment Is Precluded by Evidence That Connecticut
        Was on Notice of Its Alleged Injury Well Before 2006. ........................................ 7

        1.  The Duty to Mitigate Is Triggered by Inquiry Notice................................. 7

        2.  There Is Abundant Evidence That Connecticut Was on
            Notice of Its Alleged Injury as Early as 2002............................................ 9

III. MITIGATION IS INAPPLICABLE TO CONNECTICUT'S CUTPA
     CLAIMS BECAUSE DAMAGES ARE NOT AVAILABLE UNDER
     CUTPA. ..................................................................................................................... 14

IV. MCKESSON DOES NOT OPPOSE THE STATE'S ARGUMENTS
    REGARDING THE CUTPA STATUTE OF LIMITATIONS. ....................................... 15

CONCLUSION.......................................................................................................................... 16

# TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Allied Int'l v. Int'l Longshoremen's Ass'n*,
   814 F.2d 32 (1st Cir. 1987).................................................................................................5

*Bieter Co. v. Blomquist*,
   987 F.2d 1319 (8th Cir. 1993) ...........................................................................................3

*Cambridge Plating Co. v. NAPCO*,
   876 F. Supp. 326 (D. Mass. 1995),
   *rev'd on other grounds*, 85 F.3d 752 (1st Cir. 1996)...................................................3

*Computer Sys. of Am., Inc. v. Data Gen. Corp.*,
   921 F.2d 386 (1st Cir. 1990)..............................................................................................4

*Continental Group, Inc. v. Lincoln Land Moving & Storage, Inc.*,
   710 F.2d 368 (7th Cir. 1983) .............................................................................................8

*Harding v. Cianbro Corp.*,
   498 F. Supp. 2d 344 (D. Me. 2007) ...............................................................................2, 3

*Hernandez v. Balakian*,
   2007 U.S. Dist. LEXIS 43680 (E.D. Cal. June 1, 2007).................................................3

*Importers Center, Inc. v. Newell Cos.*,
   758 F.2d 17 (1st Cir. 1985)............................................................................................5, 6

*In re Visa Check/MasterMoney Antitrust Litig.*,
   280 F.3d 124 (2d Cir. 2001)...............................................................................................3

*Kratze v. Independent Order of Oddfellows*,
   500 N.W.2d 115 (Mich. 1993)............................................................................................2

*Lares Group, II v. Tobin*,
   221 F.3d 41 (1st Cir. 2000).........................................................................................15, 16

*Leisure Resort Tech., Inc. v. Trading Cove Assocs.*,
   277 Conn. 21 (2006) ........................................................................................................15

*Lone Mountain Processing, Inc. v. Bowser-Morner, Inc.*,
   2005 U.S. Dist. LEXIS 16340 (W.D. Va. Aug. 10, 2005) ...............................................8

*Lopez v. Aran*,
   894 F.2d 16 (1st Cir. 1990)............................................................................................2, 3

*Marin v. Evans*,
  2007 U.S. Dist. LEXIS 13492 (E.D. Wash. 2007) ...................................................................3

*Merrill, Lynch, Pierce, Fenner & Smith, Inc. v. Millar*,
  274 F. Supp. 2d 701 (W.D. Pa. 2003)......................................................................................8

*Monex Int'l Ltd. v. Commodity Futures Trading Comm'n*,
  83 F.3d 1130 (9th Cir. 1995) ...................................................................................................3

*Morgan, Olmstead, Kennedy & Gardner, Inc. v. Schipa*,
  585 F. Supp. 245 (S.D.N.Y. 1984)...........................................................................................2

*Nat'l Ass'n of Chain Drug Stores v. New England Carpenters Health Benefits Fund*,
  582 F.3d 30 (1st Cir. 2009).......................................................................................................7

*New England Carpenters Health Benefits Fund v. First DataBank*,
   248 F.R.D. 363 (D. Mass. 2008)..............................................................................................3

*Peck Iron & Metal Co. v. United States*,
  221 Ct. Cl. 37 (Ct. Cl. 1979).....................................................................................................8

*Rodriguez-Torres v. Caribbean Forms Mfr., Inc.*,
  399 F.3d 52 (1st Cir. 2005).......................................................................................................2

*Security Nat'l Bank v. Recreational Dimensions, Inc.*,
  1991 Mass. App. Div. 21 (1991)...............................................................................................8

*Snead v. Holloman*,
  400 S.E.2d 91 (N.C. Ct. App. 1991) .........................................................................................6

*Sorce v. Frank*,
  1993 U.S. Dist. LEXIS 1302 (N.D. Ill. Feb. 8, 1993) ..............................................................6

*S. Cal. Fed. S&L Ass'n v. United States*,
  57 Fed. Cl. 598 (2003) ..............................................................................................................4

*S. Cal. Fed. S&L Ass'n v. United States*,
  422 F.3d 1319 (Fed. Cir. 2005).................................................................................................4

*Spedag Americas, Inc. v. Petters Hospitality & Entm't Group LLC*,
  2008 U.S. Dist. LEXIS 62911 (S.D. Fla. Aug. 18, 2008).........................................................8

*State v. Cardwell*,
  246 Conn. 721 (1998) ..............................................................................................................15

*Tauber v. City of Chicago*,
  1997 U.S. Dist. LEXIS 7332 (N.D. Ill. May 16, 1997).............................................................8

*Town of New Hartford v. Conn. Res. Recovery Auth.*,
  291 Conn. 433 (2009) .......................................................................................................14, 15

*Travelers Indem. Co. v. Maho Machine Tool Corp.*,
  952 F.2d 26 (2d Cir. 1991)...........................................................................................................4

*Union Planters Bank, N.A. v. Cont'l Cas. Co.*,
  478 F.3d 759 (6th Cir. 2007) .......................................................................................................8

*Wartzman v. Hightower Productions, Ltd.*,
  456 A.2d 82 (Md. Ct. Spec. App. 1983) ......................................................................................4

*Willever v. Sovereign Bank*,
  42 Pa. D. & C.4th 562 (Pa. Com. Pl. 1998) ................................................................................8

**OTHER AUTHORITIES**

4 Hon. Jed S. Rakoff & John S. Siffert, *Modern Federal Jury Instructions – Civil P.* 77.01
  Instruction 77-7 .............................................................................................................................6

Local Rule 7.1(a)(2).............................................................................................................................15

## INTRODUCTION

Connecticut's motion raises the same issues that were the subject of its Motion to Strike Affirmative Defenses, which the Court denied last August.  (Electronic Order (Aug. 6, 2009).)  The new brief recycles the same arguments and caselaw that the State previously relied on, only here it asks the Court to "dismiss"—instead of "strike"—McKesson's mitigation defense. (Mem. in Supp. of Mot. for Summ. J. ("Mem.") at 1, 8, 15.)  Other than that shift in terminology, the State offers no new reasons why the Court should revisit its earlier decision.

As discussed below, Connecticut's motion continues to misstate the applicable law and ignores a host of disputed issues directly relevant to McKesson's mitigation defense.  For example, contrary to Connecticut's argument that it had no duty to mitigate its RICO damages, the First Circuit holds that plaintiffs have the duty to mitigate "in all cases," as does every case to consider the duty in the RICO context.  Moreover, contrary to the State's argument, the duty to mitigate is triggered by facts sufficient to constitute inquiry notice, rather than actual knowledge of the "Scheme" as Connecticut contends.  McKesson will present ample evidence at trial showing that Connecticut knew or should have known of its injuries as early as 2002.  In the face of this evidence, the assessment of when Connecticut was on notice of its alleged injury and whether it acted reasonably in failing to mitigate thereafter presents a classic jury issue that precludes entry of summary judgment.

Connecticut also argues that the duty to mitigate damages is inapplicable to its Connecticut Unfair Trade Practices Act ("CUTPA") claims that allege "deceptive" conduct.  The State is correct, but the distinction between "deceptive" and "unfair" conduct has nothing to do with it.  Rather, damages mitigation is irrelevant to its CUTPA claims, because the State cannot seek damages under CUTPA; it can only recover penalties and restitution.  Because mitigation is irrelevant to either remedy, summary judgment should be denied on this issue as well.[1]

---

[1] As for the remaining issue in Connecticut's motion, McKesson agrees that the CUTPA statute of limitations does not apply to actions brought by the State.  Connecticut could have avoided briefing this issue if it had met and conferred with McKesson prior to filing its motion.

**ARGUMENT**

**I.    SUMMARY JUDGMENT SHOULD BE DENIED BECAUSE CONNECTICUT IS WRONG AS A MATTER OF LAW IN ASSERTING THAT THERE IS NO DUTY TO MITIGATE RICO DAMAGES.**

Connecticut's motion is premised on two erroneous legal propositions, which the State contends bar McKesson's mitigation defense as a matter of law.  First, Connecticut argues that its duty to mitigate "does not arise" because the complaint alleges an intentional tort.[2]  (Mem. 9-10.)  Second, it argues that "the State had no duty to mitigate" because McKesson was in a better position to prevent the harm.  (*Id.* at 11.)[3]  Both propositions fly in the face of controlling First Circuit authority, which recognizes that "[a]ssuming it can be reasonably effected, there is a duty in *all* cases to mitigate damages."  *Lopez v. Aran*, 894 F.2d 16, 19 (1st Cir. 1990) (emphasis added).

While the State claims that "many courts" hold that this duty "will not apply" where the complaint alleges an intentional tort, it cites only two inapposite out-of-circuit decisions in support of that assertion.  (Mem. 10-11.)[4]  Notwithstanding Connecticut's assertion, courts in the First Circuit consistently hold plaintiffs to the duty of mitigation without regard to whether the tort was intentional.  *See, e.g.*, *Rodriguez-Torres v. Caribbean Forms Mfr., Inc.*, 399 F.3d 52, 67 (1st Cir. 2005) (requiring plaintiff to mitigate her damages resulting from her employer's intentional gender discrimination); *Harding v. Cianbro Corp.*, 498 F. Supp. 2d 344, 358 n.18

---

[2] The State's brief alternates between saying its duty of mitigation never "arose," and acknowledging that it did arise, but was "lessened." (*See* Mem. 9-10.)  To the extent that the State's real argument is that its duty was "lessened," that presents numerous questions of fact for the jury, as laid out in Section II, below.

[3] The State acknowledges that these issues were already addressed in last year's motion to strike, but it seeks to distance itself from that earlier motion by presuming that in denying the motion, the Court found fault only with the motion's timeliness. (*See* Mem. 4 n.11, 8 (Connecticut arguing that *its own motion* was untimely).)  The denial, however, was not so limited. (*See* Electronic Order (Aug. 6, 2009).)

[4] The first citation is to a footnote in a Michigan case that had nothing to do with mitigation, *Kratze v. Independent Order of Oddfellows*, 500 N.W.2d 115, 141 n.2 (Mich. 1993), and the second is to a 25-year-old New York case in which the defendants in a securities fraud case contended that the plaintiffs were barred from recovery because they had not followed their own standard business practices, which allegedly would have discovered the fraud. *Morgan, Olmstead, Kennedy & Gardner, Inc. v. Schipa*, 585 F. Supp. 245 (S.D.N.Y. 1984).

(D. Me. 2007) (requiring the plaintiff to mitigate damages where his employer intentionally fired him due to his health condition); *Cambridge Plating Co. v. NAPCO*, 876 F. Supp. 326, 345 (D. Mass. 1995), *rev'd on other grounds*, 85 F.3d 752 (1st Cir. 1996) (requiring mitigation from the victim of intentional misrepresentation).  Plaintiffs can hardly be surprised to learn that an intentional tort does not affect a plaintiff's duty to mitigate in this jurisdiction.  Mitigation by the TPP plaintiffs in *New England Carpenters* was "a hotly disputed factual issue," and was one of the main reasons why the class damages period was cut off at December 31, 2003.  248 F.R.D. 363, 367, 372 (D. Mass. 2008).

Looking at caselaw from the RICO context confirms that Connecticut is wrong.  RICO is a type of intentional tort, yet all of the RICO cases to consider the duty of mitigation have held that the duty applies.  *See Bieter Co. v. Blomquist*, 987 F.2d 1319, 1329 (8th Cir. 1993) (holding that a RICO jury had to consider the plaintiff's failure to mitigate, because the "limitations on damages suggested by tort law would also apply to civil RICO."); *Hernandez v. Balakian*, 2007 U.S. Dist. LEXIS 43680, at *19-26 (E.D. Cal. June 1, 2007) (permitting mitigation as a defense to RICO); *Marin v. Evans*, 2007 U.S. Dist. LEXIS 13492, at *3-9 (E.D. Wash. 2007) (same).  Courts have found good policy reasons for holding RICO plaintiffs to the duty to mitigate, because otherwise a "plaintiff seeking treble damages can profit by avoiding mitigation."  *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 149-50 (2d Cir. 2001) (Jacobs, C.J., dissenting on other grounds).  The State's brief completely ignores all of this precedent in favor of, for example, a 27-year-old case from a Maryland State appellate court about the world record for flagpole sitting.  (Mem. 14.)

Connecticut's alternative theory—that it "had no duty to mitigate because McKesson was in a better position to prevent the harm"—is even more farfetched.  (Mem. 11.)  As noted, the First Circuit holds that mitigation is required "in all cases," *Lopez*, 894 F.2d at 19.  None of the authority Connecticut cites contradicts that proposition.  *See Monex Int'l Ltd. v. Commodity Futures Trading Comm'n*, 83 F.3d 1130, 1135-36 (9th Cir. 1995) (recognizing a plaintiff's general duty to mitigate, but holding that the duty did not apply because the disputed contract

had been rescinded); *Computer Sys. of Am., Inc. v. Data Gen. Corp.*, 921 F.2d 386, 392 (1st Cir. 1990) (recognizing the general duty to mitigate, but holding that the form of mitigation urged by the defendant—simply throwing away the disputed property rather than paying storage charges—was not reasonable).[5]

The absurdity of Connecticut's argument is demonstrated by its own summary of the proposition:  "McKesson caused the harm by its conduct, therefore McKesson, not the State, was obligated to mitigate damages."  (Mem. 13.)  But, of course, every defendant (if found liable at the end of the trial) "caused the harm by its conduct."  If that were all that a plaintiff needs to show to relieve itself of its duty to mitigate damages, there would be no such defense at all.

Finally, even if the State were right that a plaintiff has no duty to mitigate where a defendant was in a better position to prevent the injury, it points to no evidence to show that McKesson was in that position.  To the contrary, Connecticut has at all times been free to reduce its Medicaid payment formula, and did so repeatedly between 2002 and 2005.  (Declaration of Lori A. Schechter in Opp'n to Pls.' Mot. for Summ. J. ("Schechter Decl."), Ex. 22 (Dep. Ex. 254).)  Moreover, the markups that Connecticut claims caused its injury were FDB's, not McKesson's.  The State offers no evidence to show how McKesson could have reversed FDB's actions.  In fact, the evidence on this point indicates just the opposite—FDB's March 2005 announcement, for one, declares that AWPs would no longer be based on surveys of McKesson

---

[5] Connecticut relied on this very same authority in its unsuccessful motion to strike, and the additional cases the State cites in this new brief are either bad law or easily distinguishable.  *See S. Cal. Fed. S&L Ass'n v. United States*, 57 Fed. Cl. 598, 640-41 (2003) (holding that mitigation did not require the plaintiffs to throw millions of dollars of good money after bad, and concluding that "the Individual Plaintiffs acted reasonably and diligently"), *portion cited by Connecticut vacated by S. Cal. Fed. S&L Ass'n v. United States*, 422 F.3d 1319, 1324 (Fed. Cir. 2005); *Travelers Indem. Co. v. Maho Machine Tool Corp.*, 952 F.2d 26, 30-31 (2d Cir. 1991) (holding that mitigation was irrelevant because under the UCC it was the seller of non-conforming goods, and not the plaintiff-buyer, who had the duty to pay for the return of the goods); *Wartzman v. Hightower Productions, Ltd.*, 456 A.2d 82, 88 (Md. Ct. Spec. App. 1983) (rejecting the defendant-attorney's argument that the plaintiff-company he negligently advised should have mitigated its damages by hiring a lawyer more knowledgeable than himself).

or anyone else, and would instead be marked up a uniform 25%.  (*See* First Am. Compl. ¶ 244 [Docket No. 22] (copying text of announcement).)  For the next four years, FDB steadfastly refused to reverse that decision, and ultimately rolled back AWP markups last September only after its settlement in the *New England Carpenters* case had been affirmed on appeal.  The State does not suggest how McKesson could have hastened that result.

## II. FACTUAL ISSUES CONCERNING WHEN CONNECTICUT'S DUTY OF MITIGATION AROSE, AND WHETHER THE STATE SATISFIED ITS DUTY, PRECLUDE SUMMARY JUDGMENT.

As an alternative to its unfounded arguments that it "had no duty to mitigate" (Mem. 9), Connecticut acknowledges that it *did* have the duty, but contends that the duty arose only in October 2006, when the State learned the details of the so-called "Scheme."  (*Id.* at 11.) Connecticut's fallback position does not warrant taking the mitigation defense away from the jury.  Even accepting that Connecticut's duty to mitigate did not arise until October 2006, which McKesson vigorously disputes, summary judgment would be improper because the jury would still need to decide whether the State acted reasonably in failing to mitigate thereafter.  More fundamentally, there is a triable issue of material fact as to whether Connecticut knew or should have known of its alleged injuries and taken steps to mitigate well before October 2006.

### A. Connecticut's Admission That It Has Known of the Alleged "Scheme" Since at Least 2006 Precludes Summary Judgment.

Connecticut concedes that under "*the established rule*," a duty to mitigate arises as soon as "the injured party is aware that it has been or still is being injured by another."  (Mem. 10, emphasis added).  As discussed in the next section, it is well-established that inquiry notice, rather than actual knowledge, is sufficient to trigger the duty to mitigate.  But even under Connecticut's formulation, by its own admission the State has known all of the details of the alleged scheme since October 2006.  From that point on, Connecticut indisputably had a duty to mitigate, and there is an obvious factual dispute as to whether the State's inaction was reasonable.  *Allied Int'l v. Int'l Longshoremen's Ass'n*, 814 F.2d 32, 39 (1st Cir. 1987) (describing mitigation as "a classic question of fact"); *Importers Center, Inc. v. Newell Cos.*,

758 F.2d 17, 21 n.5 (1st Cir. 1985) ("the question of mitigation is chiefly one of fact for the district court."); *see also* Mem. 9 (acknowledging that McKesson is entitled to "prevail on its mitigation defense" if the State "was aware of the scheme and intentionally or recklessly failed to protect itself.").

Connecticut's Statement of Undisputed Material Facts ("Statement") [Docket No. 67]) asserts only one salient "fact":  that "[t]he earliest the State of Connecticut could have become aware of McKesson's scheme to increase AWP markups was October 5, 2006, when First DataBank announced that it would be rolling back the AWP markups for its brand drugs."  *See also* Mem. 2 (Connecticut "was not aware of McKesson's scheme until at the earliest the First DataBank settlement announcement").  Connecticut's own complaint pegs the date even earlier—the filing of the *New England Carpenters* action in June 2005.  (*See* First Am. Compl. ¶ 245 [Docket No. 22] (alleging that the State "had no knowledge of the combination and conspiracy alleged herein . . . prior to the filing of [the *New England Carpenters*] complaint").).)

Regardless whether the State was on notice of the alleged scheme in June 2005 or October 2006, the factual question of whether the State took reasonable steps thereafter to mitigate its damages is unquestionably one for the jury.  *See Importers Center*, 758 F.2d at 21 n.5; *Sorce v. Frank*, 1993 U.S. Dist. LEXIS 1302, at *20-21 (N.D. Ill. Feb. 8, 1993) ("*mitigation is a question of fact for the jury.*") (emphasis in original); *Snead v. Holloman*, 400 S.E.2d 91, 94 (N.C. Ct. App. 1991) ("Since the test is one of reasonableness, . . . it is a jury question except in the clearest of cases.") (quotation omitted); 4 Hon. Jed S. Rakoff & John S. Siffert, *Modern Federal Jury Instructions – Civil P.* 77.01, Instruction 77-7 (2009) ("Bear in mind that the question whether the plaintiff acted 'reasonably' with respect to the mitigation of damages is one for you to decide, as sole judges of the facts.").

Connecticut argues that it acted reasonably in not mitigating its damages after it learned of the "Scheme" for a handful of reasons, among them that it would have been "expensive" and "difficult to justify to the legislature."  (Mem. 2.)  But the Commissioner of Connecticut's Department of Social Services, which oversaw the administration of the Medicaid program,

conceded at his deposition that he knew that eight or ten other states, including Massachusetts and Rhode Island, used WAC, and acknowledged that he never had "anybody on [his] staff ever undertake any sort of quantitative analysis to determine whether a WAC-plus approach would be more beneficial to the taxpayers of the State." (Schechter Decl. Ex. 21 (Starkowski Dep. 130:8-22, Dec. 7, 2009).) Moreover, there are a number of other things besides switching to WAC that Connecticut could have done, such as increasing the discount off AWP or lowering the dispensing fee. It is, of course, up to the jury to decide whether the purported difficulty of "justifying" such actions to the legislature made it reasonable for State to do nothing, especially where the Connecticut legislature, at the urging of the Department of Social Service, had already decreased the dispensing fee four times and increased the AWP discount once between September 2002 and August 2005. (*Id.* Ex. 22 (Dep. Ex. 254).)

### B.     Summary Judgment Is Precluded by Evidence That Connecticut Was on Notice of Its Alleged Injury Well Before 2006.

### 1.     The Duty to Mitigate Is Triggered by Inquiry Notice.

Summary judgment should be denied for the further reason that Connecticut was on inquiry notice of its alleged injury as early as 2002. Contrary to the State's assertion, actual knowledge of Connecticut's alleged injury is not required to trigger the duty to mitigate. It is well-established that the duty arises as soon as the plaintiff knew or should have known that is has been injured by another.

The First Circuit's opinion affirming FDB's settlement in the earlier *New England Carpenters* case confirms that mitigation does not depend on a plaintiff's actual knowledge of the specific cause of its alleged injuries. *Nat'l Ass'n of Chain Drug Stores v. New England Carpenters Health Benefits Fund*, 582 F.3d 30, 41 (1st Cir. 2009). There, the court observed that each improvement to a payor's reimbursement rate "to some uncertain extent negates the effect of the falsely inflated AWP figures." *Id.* The court rejected plaintiffs' argument that such mitigation of damages would only be effective if the payor acted with knowledge of the so-called "Scheme." *Id.* at n.10 ("How far recapture has occurred for TPPs or PBMs is hotly disputed, but

lack of knowledge of wrongdoing does not automatically preclude some recapture through competitive forces.").

The First Circuit's ruling in *NACDS* is on all fours with the caselaw holding that the duty to mitigate arises as soon as the plaintiff is on inquiry notice of its injury. *See, e.g.*, *Continental Group, Inc. v. Lincoln Land Moving & Storage, Inc.*, 710 F.2d 368, 371-72 (7th Cir. 1983) (noting that "the determining factor" for the mitigation question was the date on which the plaintiff "knew, or should have known" that its property was being damaged); *Spedag Americas, Inc. v. Petters Hospitality & Entm't Group LLC*, 2008 U.S. Dist. LEXIS 62911, at *19-22 (S.D. Fla. Aug. 18, 2008) (holding that the duty of mitigation attached when the plaintiff "knew or should have known" of its business partner's insolvency); *Merrill, Lynch, Pierce, Fenner & Smith, Inc. v. Millar*, 274 F. Supp. 2d 701, 710 (W.D. Pa. 2003) (affirming an arbitrator's use of the "knew or should have known" standard); *Tauber v. City of Chicago*, 1997 U.S. Dist. LEXIS 7332, at *5-6 (N.D. Ill. May 16, 1997) (noting that without a "should have known" requirement, "a plaintiff could simply play ostrich and then be rewarded for his or her lack of diligence.").[6]

---

[6] One of the cases Connecticut cites in support of its actual knowledge argument actually holds the opposite. In *Lone Mountain Processing, Inc. v. Bowser-Morner, Inc.*, 2005 U.S. Dist. LEXIS 16340 (W.D. Va. Aug. 10, 2005), defendant moved for summary judgment that plaintiff's knowledge of leaks in a retention pond that defendant built triggered a duty to mitigate. The court denied summary judgment, holding that "reasonable jurors could differ as to whether Lone Mountain *knew or should have known*" that the earlier leaks were predictive of the subsequent collapse. *Id.* at *30-31 (emphasis added). The other cases Connecticut cites focus not on whether inquiry or actual notice is required, but instead on the reasonableness of the plaintiff's response, *Security Nat'l Bank v. Recreational Dimensions, Inc.*, 1991 Mass. App. Div. 21, 22-23 (1991) (recognizing the duty to mitigate, but making the factual conclusion that "[s]imply stated, the evidence is insufficient to charge the defendants with negligence in failing to discover the Bank's error."); *Willever v. Sovereign Bank*, 42 Pa. D. & C.4th 562, 574-575 (Pa. Com. Pl. 1998) (recognizing the duty to mitigate, and making the factual finding "the plaintiff took more than reasonable steps to mitigate"), or discuss actual knowledge in the context of the defendant's alleged fraudulent concealment. *Union Planters Bank, N.A. v. Cont'l Cas. Co.*, 478 F.3d 759, 765 (6th Cir. 2007); *Peck Iron & Metal Co. v. United States*, 221 Ct. Cl. 37, 40-41 (Ct. Cl. 1979). Even assuming these cases can be squared with the First Circuit's ruling in *NACDS*, the question of whether McKesson engaged in fraudulent concealment that excused Connecticut's duty to mitigate presents disputed issues of material fact that cannot be resolved on summary judgment.

**2.      There Is Abundant Evidence That Connecticut Was on Notice
of Its Alleged Injury as Early as 2002.**

The jury will hear evidence that Connecticut avoided most or all of the impact flowing

from the spread increases by decreasing its dispensing fee four times, and increasing its AWP

discount one time, between September 2002 and August 2005.  The State's Medicaid Pharmacy

Manager agreed that these actions were taken "in response to increasing costs [she had] seen

during the years 2002, 2003, 2004, 2005" and acknowledged that the cost-cutting actions were

not merely an extension of a pre-existing trend.  (Schechter Decl. Ex. 1 (Dudley Dep. 57:1-58:8;

51:18-52:19, Dec. 9, 2009) (stating that Connecticut had not previously changed its dispensing

fee since 1991, and had not changed its discount since 1995).)  Whether these steps were

sufficient to mitigate some or all of Connecticut's alleged injuries, and whether the State should

have done more, present classic jury questions.  That is particularly true where, as here, the jury

will be presented with abundant evidence that Connecticut knew or should have known of its

alleged injury from shortly after the inception of the alleged scheme.

**The jury will hear that Connecticut was notified that FDB was misrepresenting its**

**survey process.**  On October 31, 2002, the drug manufacturer Genzyme wrote a letter reporting

that FDB had "unilaterally increased" the AWP on three of Genzyme's drugs.  (*Id*. Ex. 23 (Dep.

Ex. 228).)  The letter disputed FDB's assertion that its prices were based on wholesaler

surveys—Genzyme described how it had contacted its two main wholesalers and learned that

they had no knowledge of the markup increases, and had not even been contacted by FDB.  (*Id*.)

Genzyme then specifically told the Medicaid agency that it was being injured:  "[W]*e are*

*concerned that reliance on First DataBank AWP information for payment purposes may lead*

*public and private payors to overpay for Genzyme products*."  (*Id.*; emphasis added.)  Finally,

Genzyme told the agency how it could avoid the impact of the price increases:  "We suggest you

consider using information sources other than First Databank when calculating reimbursement . .

. . Our most recent review of Red Book indicates that the AWPs reported for Genzyme products

[have] not changed."  (*Id.*)  The letter produced in discovery was addressed to the Wisconsin

9

Medicaid agency, but its author testified that it was "likely" distributed to all other states. (Schechter Decl. Ex. 2 (van Heek Dep. 58:3-13, Nov. 24, 2009).)

Two weeks later, on November 14, 2002, pharmaceutical manufacturer Baxter wrote Connecticut a similar letter.  (*Id*. Ex. 24 (Dep. Ex. 295).)  Baxter reported that whereas FDB had previously reported Baxter's prices faithfully, beginning with the June 2001 prices, FDB had "appl[ied] a new methodology, adding approximately 25% to Baxter BioScience's list prices and reported these amounts as AWPs."  (*Id.*)  The letter further reports that, despite Baxter's attempts, FDB "has refused to correct its new reporting practices and continues to report as AWPs prices that are approximately 25% higher than Baxter BioScience's list prices."  (*Id.*)  The letter concluded that FDB's prices "should not be relied upon" and suggested that the State switch its reimbursements to Red Book pricing.  (*Id.*)  The letter's author testified that it was sent "to every single Medicaid pharmacy director in the country."  (Schechter Decl. Ex. 3 (Bradley Dep. 63:7-11, Dec. 8, 2009).)

Further doubt was cast on the legitimacy of FDB's surveys by FDB itself.  In March 2004, FDB attorney Mark Redman sent Connecticut an advance copy of a letter FDB planned to send to all Medicaid agencies, advising them that it was planning to stop publishing AWPs. (Schechter Decl. Ex. 4 (Dep. Ex. 368 at CONN_MCK 020683, 020685).)  FDB proposed that it would continue to give the AWP field to states that requested it only on the condition that the state sign a release absolving FDB of all liability "for any use, or misuse, of the Blue Book AWP data," and only if the State covenanted that it would "take no action against FDB for providing such information."  (*Id.* at CONN_MCK 020684.)  A member of the Connecticut Attorney General's office subsequently participated in a phone call with Mr. Redman to discuss the issue. (*Id.* at CONN_MCK 020685.)

**The jury will hear that Connecticut was on notice that markups had increased to 25%.**  The Connecticut Medicaid agency's Pharmacy Manager testified that "in the years before" 2005, the state had understood that the "markup factor WAC to AWP was anywhere between 20 and 25."  (*Id.* Ex. 1 (Dudley Dep. 94:4-8).)  Then, in the summer of 2004,

Connecticut was told that markups had moved to a uniform 25%.  That information came through an email listserv that the pharmacy administrators for all 50 Medicaid agencies use to share pertinent knowledge.[7]  On June 16, 2004, members of the listserv engaged in a discussion of the spread between AWP and WAC.  One member reported that "[g]enerally WAC equals AWP times 0.8 [;] AWP equals WAC times 1.25," (*i.e.*, a 25% markup).  (*Id.* Ex. 5 (Dep. Ex. 261).)  Another noted that he had received a "complaint" that the higher markups resulted from "changes [that] had occurred via FDB/Medispan."  (*Id.* Ex. 6 (Dep. Ex. 260).)  With regard to those emails, the pharmacy manager for the State of Montana, which is a named plaintiff in the related *Douglas County* action, testified:

> Q:  From this e-mail Mr. Oestreich is indicating to the group that the markup between WAC and AWP is increasing?
>
> A:  Yes.
>
> Q:  And Mr. Oestreich is telling people that it increased at some point before June 16th, 2004?
>
> A:  Yes.

(*Id.* Ex. 8 (Peterson Dep. 126:22-127:4, Jan. 20, 2010).)  A jury could reasonably find that Connecticut should have reached the same conclusion.

If Connecticut did not know of the changing markups and the suspicions regarding FDB's survey by the summer of 2004, it certainly was apprised of those issues when FDB announced the end of the survey process and the uniform 25% markup on March 15, 2005.  Connecticut's Pharmacy Manager was the addressee on at least two emails discussing the announcement.  ( *Id.* Ex. 9 (CONN__MCK 107826-27); *id* Ex. 10 (CONN__MCK 107843).)  The author (a pharmacist with Connecticut Medicaid) described the email string as "concerning

---

[7] Connecticut is a member of an organization called the American Medicaid Pharmacy Administrators Association (AMPAA) and a related organization called the Eastern Medicaid Pharmacy Administrators Association (EMPAA), whose purpose is "to share and communicate ideas to improve [member States'] understanding of current Medicaid issues and possible solutions." (*See* www.empaa.org.)  AMPAA coordinated an email listserv that was monitored by Connecticut Medicaid officials.  (Schechter Decl. Ex. 7 (Zakszewski Dep. 36:10-37:24; 40:7-24, Dec. 8, 2009).)

FDB's change in pricing methodology," and noted that "the proposed change in payment methodology will be a major impact." (*Id.* Ex. 10 (CONN__MCK 107843).) Finally, on July 1, 2005, the representative of Indiana's Medicaid program sent an analysis to the email listserv precisely plotting the markup increases by year, and calling recipients' attention to the "dramatic change between 2000 and 2002." (*Id.* Ex. 25 (Dep. Ex. 253).)

Furthermore, Connecticut was on notice that the AWP inflation originated with FDB, not the manufacturers. On May 5, 2003, two state attorneys from Connecticut received an email from the California Medicaid Fraud Control Unit telling them that pharmaceutical manufacturer Dey had sued FDB and Medi-Span because the publishers had refused to print the AWP that Dey desired. (Schechter Decl. Ex. 11 (Dep. Ex. 537).) This email came on the heels of a meeting of the Pharmacy Technical Advisory Group—a committee convened by CMS and the National Association of State Medicaid Directors (NASMD)—at which FDB's "inflated AWPs" were discussed. An agenda for that call and a set of associated handwritten notes have been produced in discovery.[8] (*Id.* Ex. 12 (Dep. Ex. 107).) In connection with the agenda item titled "State Use of Suggested Wholesale Price (SWP) and Average Wholesale Price (AWP)," the handwritten notes read "**Why AWP inflated; what do to aboutt** [sic] **it?** Get SWP from manufact . . . 6.6% lower than AWP across the board . . . request SWP on 1st DB tape." (*Id.* Ex. 12 at P09930, emphasis added.)

**The jury will also hear that Connecticut was on notice of spiraling Medicaid drug costs.** In addition to the foregoing evidence specifically drawing attention to FDB's pricing practices, the State was on continual notice during this period that its prescription drug reimbursements were increasing at an alarming rate. In testimony submitted to the Connecticut

---

[8] The agenda was produced by Oklahoma, rather than Connecticut. Connecticut's Medicaid Director, David Parrella, testified that he was member of NASMD Executive Committee since the late 1990s, and was Chair of the organization beginning in January 2003. (Schechter Decl. Ex. 13 (Parrella Dep. 38:5-40:8, Jan. 13, 2010).) Mr. Parrella testified that he exchanged emails with members of the PTAG concerning pharmacy issues, but did not recall whether he regularly received copies of meeting agendas and minutes. (*Id.* at 45:8-46:16.)

legislature in March 2002, the Department of Social Services reported that "pharmacy expenditures are $17 million above the original appropriation."  (Schechter Decl. Ex. 14 (Dep. Ex. 237 at CT 0023120).)  The State's former Medicaid Director testified that the overruns were revealed by the periodic reports that the agency prepared to track pharmacy expenditures against budget.  (*Id*. Ex. 13 (Parella Dep. 182:24-184:15).)  He further admitted that even though his department knew of the overruns, it did not undertake an investigation into the reasons for the budget exceedances.  (*Id*. at 187:6-13.)  Nevertheless, for the following fiscal year the Office of Policy and Management (the governor's budgetary office also known as the "OPM") proposed making a mid-term adjustment to the budget to reduce the reimbursement rate from AWP-12% to AWP-15%, and to reduce the dispensing free from $4.10 to $2.50, proposals that were ultimately rejected.  (*Id*. at 194:9-197:11 (discussing Dep. Ex. 186 at CT 0046060).)

Connecticut recognized and repeatedly emphasized this "spiraling" cost of the prescription drug benefit in the early part of the 2000s, and tried to take additional steps to control it.  (*See, e.g.*, Schechter Decl. Ex. 16 (Dep. Ex. 185 at CONN_MCK 027663); *id*. Ex. 17 (Dep. Ex. 236 at CT 038460).)  The former secretary of OPM testified that "in almost every year we proposed either an AWP discount reduction in reimbursement to the pharmacies and/or a dispensing fee reduction,"[9] that these reductions were in response to pharmacy cost increases in the "double digits,"[10] and that, despite the problems posed by a "lack of transparency" in pharmaceutical pricing practices, OPM's recommendations resulted in "pretty substantial savings" for the Connecticut Medicaid program.[11]

Finally, an OPM budget analyst for the State's Medicaid program testified that, upon reading Connecticut's AWP complaint against the manufacturers in 2004 or 2005, he specifically asked the Deputy Commissioner of the Medicaid agency why the State would continue using

---

[9] Schechter Decl. Ex. 18 (Ryan Dep. 25:19-27:3, Jan. 27, 2010).

[10] *Id.* at 146:10-24.

[11] *Id.* at 147:6-13.

AWP as its benchmark, but reported that his query was greeted by silence, then a change of topic.  (Schechter Decl. Ex. 19 (Netkin Dep. 471:22-474:16, Oct. 20, 2005).)

This evidence is more than sufficient for the jury to find that Connecticut was on notice of its alleged injury and therefore subject to a duty to mitigate, as confirmed by the responses of other states to a similar constellation of facts.  The California Medicaid agency, for example, discovered the markup increases sometime before May 2004, by which time it was "of the understanding that First Data Bank, the Department's source for AWP pricing, increased their formula for calculating AWP by 5% during 2003."  (*Id*. Ex. 26 (Dep. Ex. 219 at McKSFHP 024719).)  It responded by increasing its discount from AWP-10% to AWP-17%, effective September 1, 2004.  (*Id*. Ex. 20 (Gorospe Dep. 182:18-192:7; 96:14-97:15; 199:11-202:25, Nov. 19, 2009).)

### III.   MITIGATION IS INAPPLICABLE TO CONNECTICUT'S CUTPA CLAIMS BECAUSE DAMAGES ARE NOT AVAILABLE UNDER CUTPA.

Connecticut's argument regarding the absence of a duty to mitigate its alleged CUTPA injuries is irrelevant.  Mitigation is not implicated by any of the State's four CUTPA causes of action because, as the State recognizes, it can seek only penalties and restitution—but not damages—under CUTPA sections 42-110m and 42-110o.  (Mem. 4, n.12 (acknowledging that restitution and penalties are the only remedies it seeks).)

With regard to the difference between restitution and damages, the Connecticut Supreme Court recently wrote:

> Courts and commentators long have recognized the conceptual distinction between damages and restitution.  Damages are "intended to provide a victim with monetary compensation for an injury to his person, property or reputation"; *Bowen v. Massachusetts*, 487 U.S. 879, 893 (1988); whereas restitution aims to deprive a defendant of unjustly obtained benefits.  *See Leisure Resort Tech., Inc. v. Trading Cove Assocs.*, 277 Conn. 21, 40, 889 A.2d 785 (2006).  "The restitution claim stands in flat contrast to the damages action . . . .  The damages recovery is to compensate the plaintiff, and it pays him . . . for his losses.  The restitution claim, on the other hand, is not aimed at compensating the plaintiff, but at forcing the defendant to disgorge benefits that it

would be unjust for him to keep."  D. Dobbs, Remedies (1973) § 4.1, p. 224.

*Town of New Hartford v. Conn. Res. Recovery Auth.*, 291 Conn. 433, 460 (2009).  Connecticut courts rigidly observe this "flat contrast" between the two forms of monetary relief.  *See, e.g.*, *id.* at 461 (affirming award of $35 million in restitution even though the plaintiffs had suffered $69 million in damages, because an agreement between the parties permitted "equitable remedies," but excluded suits for "damages"); *State v. Cardwell*, 246 Conn. 721, 727 (1998) (affirming, in a section 42-110m action, the award of only restitution to purchasers of illegally sold tickets, rather than their damages).

McKesson will establish at trial that it did not reap the benefits of the AWP markup increases because the entirety of any purported benefit went to retail pharmacies.  Although plaintiffs endeavored to demonstrate a financial benefit to McKesson during discovery in *New England Carpenters*, they were unable to do so.  Because "restitution is aimed at depriving the fraudulent party of benefits obtained by the tort," *Leisure Resort Tech., Inc. v. Trading Cove Assocs.*, 277 Conn. 21, 40 (2006) (citation omitted), and there is no evidence of any benefit for McKesson to disgorge even if it were found liable, the State's argument about the role of mitigation under CUTPA is of no consequence.

## IV.     MCKESSON DOES NOT OPPOSE THE STATE'S ARGUMENTS REGARDING THE CUTPA STATUTE OF LIMITATIONS.

McKesson does not oppose the State's argument that the CUTPA causes of action are not barred by the statute of limitations.  Connecticut would have known this if, as required by Local Rule 7.1(a)(2), it had met and conferred with McKesson before filing its motion.  The State failed to do so.

While McKesson does not oppose summary judgment on this issue, paring down McKesson's statute of limitations defense regarding the CUTPA claim will have no practical impact on the trial.  The State does not challenge the applicability of RICO's four-year statute of limitations.  As McKesson described in opposing the State's motion to strike last year, RICO's clock begins to run at "the time a plaintiff knew or should have known of his injury."  *Lares*

15

*Group, II v. Tobin*, 221 F.3d 41, 44 (1st Cir. 2000). Thus, all of the evidence discussed in this brief concerning what Connecticut knew or should have known will need to be presented to the jury in support of McKesson's statute of limitations defense to Connecticut's RICO claim. Entering summary judgment on the CUTPA statute of limitations will not shorten the trial or otherwise streamline the proceedings.

## CONCLUSION

As shown above, there are numerous factual disputes presented by McKesson's mitigation defense that can only be resolved by the jury. Connecticut's motion for summary judgment should accordingly be denied.

McKesson Corporation
By its attorneys:

/s/ Lori A. Schechter
Melvin R. Goldman (*pro hac vice*)
Lori A. Schechter (*pro hac vice*)
Paul Flum (*pro hac vice*)
Morrison & Foerster LLP
425 Market Street
San Francisco, CA 94105-2482
Email:  LSchechter@mofo.com
Telephone: (415) 268-7000
Facsimile: (415) 268-7522

Robert S. Frank, Jr.
R.J. Cinquegrana
Joseph H. Zwicker
Choate, Hall & Stewart LLP
Two International Place
Boston, MA 02110
Telephone:  (617) 248-5000
Facsimile:  (617) 502-4000

Dated:  March 29, 2010

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party through the Court's electronic filing service on March 29, 2010.

/s/ Lori A. Schechter
Lori A. Schechter